The appellant, The Federal Land Bank of New Orleans (Bank), appeals from a summary judgment declaring an instrument entitled "Oil, Gas and Mineral Lease" to be a valid and subsisting lease. We affirm.
On September 5, 1974, the Bank, as lessor, executed an oil, gas and mineral lease to one Homer Lynn, covering an undivided one-half interest in and to all oil, gas and other minerals in and under the North half of the Northeast quarter, Section 28, Township 15 South, Range 13 West, in Fayette County, Alabama. Four days later, Mr. Lynn assigned his interest to appellee Terra Resources, Inc. (Terra). The other appellees subsequently acquired their royalty interests.
Terra drilled a well on the Northwest quarter of the Southeast quarter of the same section, south of the acreage covered by the Bank lease. This well was completed and shut-in
(capable of producing gas) on March 11, 1975, although actual production did not begin until November 28, 1977.
On May 6, 1977, the State Oil and Gas Board enlarged the forty-acre drilling unit, composed of the Northwest quarter of the Southeast quarter where the well was located, to include the entire East half of the section, absorbing the acreage covered by the Bank lease.
On February 13, 1978, the Bank notified Terra that the lease had been terminated by Terra's failure to make certain shut-in
payments specified in the lease. Terra and the other appellees then instituted this suit for a declaratory judgment that the lease was valid and in full force and effect. The trial judge granted summary judgment for the appellees, holding that theshut-in payments alleged by the Bank to be required to be paid it were in fact not due, since no well had been drilled andshut-in on the premises covered by the Bank lease. The Bank appeals from that judgment.
The Bank lease prepared by it contains detailed provisions concerning termination of the lease and various payments to be made. Before the sequence of events resulting in this suit can be understood, the pertinent lease provisions must be set out.
Section II of the lease establishes the five-year primary term, subject to certain conditions: *Page 316 
 "Subject to the other provisions herein contained, this lease shall be for a term of Five years from this date (called primary term) and as long thereafter as oil, gas, or any other mineral is produced from said land in paying quantities, or as
 long as any payment is made or any conditions exists [sic] which, as hereinafter provided, continues this lease in force."
If no well is actually drilled on the leased property within one year of the date of the lease, the lease automatically terminates unless a payment, called delay rental or rental, is made to the Bank. The rental payment must be made annually as long as no well is drilled on the premises, and cannot extend the lease beyond the primary term. These provisions are set out in Section IV, which reads, in pertinent part, as follows:
 "If a well is not actually spudded in on said land in diligent search of oil, gas, sulphur, or other minerals on or before one year from above date, the lease shall then automatically terminate as to both parties unless on or before such date Lessee shall pay or tender to Lessor, THE FEDERAL LAND BANK OF NEW ORLEANS at NEW ORLEANS, LOUISIANA, its successors or assigns (or to such depository as may hereafter be designated in writing by Lessor or assigns) the sum of $40.00 Dollars (herein called rental) which shall cover the privilege of deferring such drilling operations (spudding in of such a well) for a period of twelve (12) months. In like manner and upon like payment or tender annually such drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. . . . Lessee, or any assignee hereunder may at any time and from time to time execute and deliver to Lessor, or to the depository named a release or releases covering all or any portion or portions of the leased premises, and thereby surrender this lease as to such portion or portions and be relieved of all obligations in connection therewith, and thereafter the rentals payable by Lessee shall be reduced in the proportion that the acreage covered hereunder is reduced by such release or releases."
If a well is actually drilled on the premises, then no delay
rental needs to be paid, but production royalties are then to be paid based on actual production, as provided in Section III 2 (d). If the well is capable of production, but is shut-in
(usually to construct necessary pipe lines) and no gas is actually produced, and the lease is not being maintained by other production or operations, then the lease will remain in effect only if the lessee makes shut-in royalty payments. These payments have the same effect as actual "production of gas" under the lease terms. Both the production royalty clause and the shut-in royalty clause appear in Section III:
"In consideration of the premises, and as royalties hereunder, Lessee covenants and agrees:
* * * * * *
 "2. To pay the Lessor royalty for gas produced from said land, including wet gas, casinghead gas and other vaporous or gaseous substances used for the extraction of gasoline, distillate, condensate, or other petroleum products as follows:
* * * * * *
 (d) On dry natural gas to pay Lessor one-eighth of the market value at the well of such gas sold or used off the leased premises.
 (e) Where there is on the leased premises a well or wells capable of producing gas, and gas is not being used off the premises or marketed therefrom and this lease is not then being maintained by other production or operations, this lease shall nevertheless remain in full force and effect for a period of 90 days after cessation of production or operations or the shutting in of said well if on or before the expiration of said 90-day period, Lessee pays or tenders to Lessor a sum equal to one-half the annual rental per acre hereinafter set forth for the number of acres then covered by this lease, or One Hundred Dollars ($100.00) per well depending upon which sum is greater. *Page 317 
Such payment shall maintain this lease in full force and effect for a period of six (6) months from the expiration of said 90-day period, and it will be considered that gas is being produced hereunder, and such payments or tender shall have the same effect as the production of gas, for all purposes hereof. Thereafter, semi-annually in like manner, upon like payments or tender this lease will continue in force and effect for successive periods of six (6) months each, so long as such payments are made, but not, however, exceeding six (6) such successive periods beyond the primary term of said lease. It is understood that the above provision or shut-in clause shall also apply to any well where gas-oil ratio is such that the Lessee is not permitted to operate such well without the use or sale of gas."
The lease further provides that the lessee may pool or combine the acreage covered by the lease with adjoining tracts, so that the Bank lease acreage becomes part of a larger production unit. In lieu of royalties elsewhere specified, the Bank is to receive royalties on production from the pooled unit in the proportion which the Bank lease acreage bears to the total acreage in the pooled unit. Operations or production anywhere in the pooled unit maintains the Bank lease as to the portion of the leased premises included within the pooled unit, whether it be all the acreage covered by the Bank lease or only a portion of it. The lease does not state that pooling has the effect of placing a well "on the leased premises," only that the payment of royalties on actual production is to be paid proportionately in that event. These provisions are contained in Section V:
 "Lessee, at its option is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with any lawful spacing rules which may be prescribed for the field in which this lease is situated by any duly authorized authority, or when to do so would, in the judgment of Lessee, promote the conservation of the oil and gas in and under and that may be produced from said premises. Lessee shall execute in writing an instrument identifying and describing the pooled acreage. In lieu of the royalties elsewhere herein specified, Lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved."
and in Section VI:
 "Notwithstanding anything to the contrary herein contained, it is understood and agreed that in the event during the primary term a portion or portions of the land covered by this lease are included with other lands in a unit or units established under the provisions of this lease, or adopted by any duly authorized authority having jurisdiction thereof or otherwise, then operations on or production from a well situated on lands embraced in such unit, shall serve to maintain this lease in force as to that portion of the leased premises embraced in such a unit, but shall not so maintain the lease on the remainder of the leased premises not embraced in such a unit and not otherwise maintained under the terms hereof beyond the next rental paying date, unless or or before such rental date Lessee shall pay or tender to Lessor, or to Lessor's credit in the manner provided in this lease, the amount of rental provided herein to be paid upon the area then covered hereby, reduced in the proportion that the acreage covered by this lease and contained in such unit or units bears to the total acreage then covered by this lease and further reduced by the amount of any shut-in gas well royalty payments made by Lessee during the rental period or portion thereof immediately preceding such rental payment date on that portion of the leased premises not embraced in such a unit. By similar tender or payments *Page 318 
on each succeeding annual rental date this lease may be so maintained in force during the remainder of the primary term as to the portion thereof not included in such unit or units."
As we have previously noted, the lease is to terminate at the end of the five-year primary term, unless extended. Production or operations on the leased premises or on a pooled unit including the leased premises will extend the lease beyond the primary term, as stated in Section VII:
 "Production in paying quantities on a portion of the leased premises or lands unitized therewith will extend this lease only to such portion of the leased premises beyond the primary term as may be then included in a producing unit or units, the size and conformity of which have been approved by any duly authorized authority having jurisdiction thereof. However, this lease shall not terminate if actual drilling operations on any portion of the leased premises, or on lands with which a portion of the leased premises may be unitized, (such unit having been approved on size and conformity with any duly authorized authority having jurisdiction thereof) are being conducted at the end of the primary term. . . ."
Moreover, shut-in royalty payments will extend the lease, having the same effect as production, as quoted above in Section III 2 (e).
To recapitulate the events culminating in this suit: September 5, 1974 — Lease made from Bank to Lynn;
September 9, 1974 — Lynn assigned interest to Terra, (other appellees subsequently acquired royalty interests);
March 11, 1975 — Well completed and shut-in on land south of acreage covered by Bank lease;
July 22, 1975 — Delay rental payment made by Terra to Bank;
July 22, 1976 — Delay rental payment made by Terra to Bank;
May 6, 1977 — Order of State Oil and Gas Board enlarging forty-acre producing unit containing a shut-in well to include the area covered by the Bank lease;
August 6, 1977 — The Bank contends the ninety-day period for payment of shut-in royalty expired. Terra contends that noshut-in royalty was due.
September 1, 1977 — Delay rental payment made by Terra to Bank;
November 28, 1977 — Actual production began;
January 10, 1978 — Division order preparatory to distributing royalty on actual gas production sent by Terra to Bank, showing Bank's proportional interest in the enlarged producing unit;
February 13, 1978 — Bank notified Terra that the lease was terminated by the failure to make shut-in royalty payments;
March 15, 1978 — Terra, under protest, tendered payment ofshut-in royalty, which was rejected by the Bank;
May 16, 1978 — Terra executed a formal pooling agreement, unitizing all the lands in the enlarged producing unit;
June 19, 1978 — Appellees filed suit for declaratory judgment;
December 18, 1978 — Summary judgment for appellees, court holding that shut-in royalty payments were not due.
If an instrument is unambiguous, its construction and effect are questions of law which may be decided, under appropriate circumstances, by summary judgment. Wheeler v. First AlabamaBank, 364 So.2d 1190 (Ala. 1978). The Bank contends that the trial judge misapplied the law in granting the summary judgment.
The Bank's position is that the order of the State Oil and Gas Board, dated May 6, 1977, enlarging the forty-acre producing unit, placed the shut-in well on the leased premises as a matter of law and triggered the shut-in royalty clause. The Bank contends that no shut-in royalty was paid within the ninety-day period prescribed by the lease and, therefore, the lease was automatically terminated. *Page 319 
We need not address the legal effect of the State Oil and Gas Board's order, nor need we discuss whether the failure to makeshut-in royalty payments, when due, results in automatic termination of the lease. Examination of the lease terms leads us to conclude, as did the trial judge, that the shut-in
royalty clause, by its own terms, never came into effect and that no shut-in royalty payments were due.
A review of the lease provisions reveals that the delay
rental clause, Section IV, applies only when "a well is not actually spudded in on said land in diligent search of . . . gas . . . on or before one year" from the date of the lease. It applies specifically during the primary term. If a well is located on the leased premises, no delay rental is due, and other provisions of the lease come into play.
After a well is drilled, the action to be taken by the lessee depends upon a number of factors. Some provisions apply only if the well is actually on the leased premises. The lease is silent as to what must be done if the well on the premises is a dry hole. Presumably, no rentals are due, and the lease will expire at the end of the primary term, if nothing else is done. "Where there is on the leased premises a well or wells capable of producing gas," but that well is shut-in, then the shut-in
royalty provision is triggered and such payments are to be made. If the well is actually producing gas, then production
royalties are due.
If the leased acreage is pooled with other acreage so that a well is located off the leased premises but within the pooled unit, other provisions come into play. There does not appear in any section of the lease a provision requiring payment ofshut-in royalty in a pooled acreage situation. Apparently, if the well is a dry hole or is shut-in at the time the pooling occurs, delay rental payments must be made until production or operations begin. Production from or operations on a well in the pooled unit maintain the lease with no requirement to paydelay rentals, as stated in Section VI. Again, the lease is silent as to what must be done if operations or production ceases, whether delay rental payments must be resumed or whether the lease remains in effect until the end of the primary term with no further payments being made.
However, the language of the shut-in clause itself is clear. That clause begins, "Where there is on the leased premises a well. . . ." If this clause had been meant to apply to a pooled unit, it would have been a simple matter for the parties to have provided for it, as was done in Section VII, viz: "on a portion of the leased premises or lands unitized therewith" and "on any portion of the leased premises, or on lands with which a portion of the leased premises may be unitized." Moreover, it would have been easy for the parties to have inserted a provision for proportional payment of shut-in royalties, as was done for production royalties in Section V.
The language of the lease and the absence of the provisions mentioned above lead us to conclude that shut-in royalties were not due to be paid in this case. After all, the lease was prepared by the Bank itself and if it had intended that such provisions be included, it would seem it would have done so.
Terra timely tendered the rental payment due on September 1, 1977. Actual production began on November 28, 1977, maintaining the lease without further rentals. Therefore, the Bank has not been deprived of its property without compensation or due process. All rentals were timely paid, and a division order preparatory to distribution of production royalties was sent by Terra to the Bank. There was no violation of the lease.
We do not consider, nor should we, what might have occurred in a hypothetical situation, or what might have been the result if the terms of the lease had been different.
Our interpretation of this lease is in accord with settled principles governing the interpretation of written instruments generally. In order to ascertain the intentions of the parties, the plain and clear meaning of the instrument's terms is to be given effect, and the parties are presumed to have intended what the terms clearly *Page 320 
state. Financial Investment Corp. v. Tukabatchee Area Council,Inc., 353 So.2d 1389 (Ala. 1977). Moreover, terms should be construed in pari materia and a construction adopted which gives effect to all the terms used. Hall v. Gulledge, 277 Ala. 580, 173 So.2d 571 (1965).
This Court's holding today is not in conflict with Gulf OilCorp. v. Deese, 275 Ala. 178, 153 So.2d 614 (1963), cited by the Bank. There, this Court was confronted with a trespass action to recover for injury to land. The opinion quoted with approval a section of the act creating the State Oil and Gas Board which stated that the portion of production allocable to each tract in a pooled unit is to be considered as if it had been produced from a well actually on that tract. This assertion does not suggest a different result in this case.Shut-in royalty payments were not at issue, nor were there any lease provisions to be interpreted in that case. It simply held that, in a trespass action, the owner of land in a "pool" had no right to complain of the lessee's entry upon his land for purposes of production although the oil well itself was actually located on adjacent lands within the "pool".
For the foregoing reasons, this cause is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and EMBRY, JJ., concur.