Earle W. Long III appeals from a judgment entered after a nonjury trial to distribute the proceeds of a condemnation award. Julien E. Marx, William T. Youngblood, and America's Best, Inc., ("Investors"), also appeal from this judgment. The trial court awarded Long $70,000 of the condemnation proceeds. Long contends that he should have received more; the Investors contend that he should have received less. The principal issue is whether the evidence supports reformation of an agreement between Long and the Investors for distribution of the proceeds from a sale of the property.
The condemnation proceeds pertain to a tract of land in Mobile County known as the Orange Grove Tank Farms. In 1980, Marx, Youngblood, A.P. Ogburn, Jr., and two other investors[1] purchased the land from Aluminum Company of America ("Alcoa") for $300,000, paying $30,000 cash and executing a $270,000 promissory note. Alcoa retained a vendor's lien on the property. Long's claim derives from Ogburn's 20% interest. There were seven petroleum storage tanks on the premises, and Youngblood testified that he had plans to convert the premises to a gasohol facility. He also testified that he knew as early as 1980 that the State had plans to condemn the land to build an interstate highway spur connecting Mobile to Interstate Highway 10. *Page 985 
Between June 1986 and January 1987, Youngblood and Marx executed a total of five notes in favor of SouthTrust Bank of Mobile to obtain short-term financing of the payments on the Alcoa note. Ogburn joined in making two of the earlier notes, but he did not join the last two, which were renewals of the earlier ones. America's Best joined in the execution of one of the two SouthTrust notes executed in January 1987. None of these notes to SouthTrust Bank was secured.
In February 1986, Ogburn executed a promissory note for $70,000 in favor of Alabama Credit Corporation. Ogburn executed a mortgage on his 20% undivided interest in the Orange Grove Tank Farms to secure this note. Until late in these proceedings, the parties consistently treated this mortgage as creating a second mortgage behind the vendor's lien held by Alcoa. In the summer of 1986, Ogburn fell behind in his contributions to the payments on the Alcoa note. Ogburn informed the Investors and Long, who was president of Alabama Credit, that he was no longer able to make payments.
After a series of negotiations, Ogburn, Youngblood, Marx, America's Best, and Long entered into the following agreement on March 12, 1987:
 "Whereas, A.P. Ogburn, Jr. ('Ogburn'), William T. Youngblood ('Youngblood'), Julien E. Marx ('Marx') and America's Best, Inc., own undivided interests in that certain real property described in a Statutory Warranty Deed, of even date herewith, in which Ogburn is the Grantor and Youngblood, Marx and America's Best are the Grantees, which said real property is hereinafter referred to by the name by which it is generally known, 'Orange Grove Tank Farms,' and
 "WHEREAS, in order to facilitate meeting certain obligations to the Aluminum Company of America and in order to provide certain short term funding for that purpose, and
 "WHEREAS, in the judgment of Earle W. Long, III ('Long'), it is in his best interest to insure that short term funding is provided to meet the obligation to Aluminum Company of America in order to protect Long's mortgage or lien against the possibility of default under the vendor's lien retained by the Aluminum Company of America,
 "NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained, TEN AND NO/100 ($10.00) DOLLARS, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:
 "1. Ogburn will deed, by Statutory Warranty Deed, his interest in the real property referred to herein as Orange Grove Tank Farms to Youngblood, Marx and America's Best, Inc. The deed shall be executed and delivered simultaneously with the execution and delivery of this Agreement for Division of Proceeds of Sale of Real Property.
 "2. Youngblood, Marx and America's Best, Inc. shall hold harmless, indemnify and provide a defense to Ogburn and Long for any and all liability, debt, note, mortgage, financial obligation, action, cause of action, or claim of any kind or nature, arising, directly or indirectly, from the ownership, operation or maintenance of Orange Grove Tank Farms, including without limitation, with respect to that certain vendor's lien retained by The Aluminum Company of America on the real property and the note therein described which is secured by the vendor's lien and those certain notes and/or mortgages in favor of SouthTrust Bank bearing commercial loan numbers 19565 and 19276.
 "3. Long does hereby agree to subordinate his mortgage on the undivided interests of Ogburn, in Orange Grove Tank Farms to this contract, provided that the proceeds of the sale of Orange Grove Tank Farms shall be divided as follows:
 "A. First, the note due to The Aluminum Company of America which is secured by the vendor's lien on Orange Grove Tank Farms shall be paid in full and the vendor's lien discharged.
 "B. Second, the notes due SouthTrust Bank bearing commercial loan number 19565 and 19276 whose present principal balances are approximately $56,862.49, shall be discharged in full. It is agreed *Page 986 
that said note may be, from time to time, renewed as necessary.
 "C. Third, reimbursement of Youngblood, Marx and America's Best, Inc. of amounts equal to a) 20% of all funds paid by them to Aluminum Company of America towards the obligation referred to in sub-paragraph A without contribution by Ogburn; and b) 22% of all funds paid by them to SouthTrust Bank towards the obligation referred to in sub-paragraph B without contribution by Ogburn; together with interest on the sums so paid from the date of payment to the date of said sale at the prime rate in effect at the time each payment was made, plus 5%. The prime rate shall be as posted at relevant times by the Chemical Bank of New York.
 "D. Fourth, to pay the costs and fees attendant to said sale.
 "E. Fifth, to discharge the note and mortgage held by Long on Ogburn's undivided interest in Orange Grove Tank Farms.
 "F. Sixth, the balance, if any, to Youngblood, Marx and America's Best, Inc."
The agreement also included an option for Long to purchase Ogburn's 20% interest within 30 days, but he elected not to do so. Two months after this agreement was executed, Alabama Credit assigned its interest in Ogburn's note and mortgage to Long.
In April 1991, the State of Alabama brought an action in the Probate Court of Mobile County to condemn the Orange Grove Tank Farms. In June 1991, the probate court entered an "Order of Condemnation," awarding $873,500, based on a report of commissioners. Both the State of Alabama and the Investors appealed from this judgment to the Circuit Court of Mobile County. The principal dispute over the valuation related to an oil spill on the property. The State's experts gave evidence that the value of the property after deducting the cost of cleaning up the oil was $0-$40,000. The Investors contended that Alcoa had agreed in 1980 to clean up the oil and that, therefore, the cost of the cleanup should be deducted from the amount due on Alcoa's note. After a trial by jury, the jury awarded $600,000 for the property. The circuit court added prejudgment interest to this amount.
Marx, Youngblood, and America's Best filed a claim for the proceeds of this condemnation award. In June 1992, as assignee of all rights held by Alabama Credit, Long also filed a claim, alleging that he was entitled to $120,469.54: the $70,000 face amount of the loan to Ogburn, plus accrued interest of $50,469.54.
The Investors filed an answer and a counterclaim for reformation, alleging that because of "inadvertent oversight and mutual mistake," paragraph 3 of the March 12, 1987, agreement failed to express the parties' intention that the reimbursement of the Investors under subparagraph 3(C) would be made only from the 20% of the proceeds attributable to Ogburn's 20% undivided interest. The Investors requested that the circuit court reform the agreement to provide that the reimbursement of the Investors under subparagraph 3(C) would be made only from Long's alleged 20% share of the proceeds and not from the proceeds as a whole. The Investors sought to have paragraph 3 of the agreement reformed to state:
 "3. Long does hereby agree to subordinate his second mortgage on the 20% undivided interest of Ogburn, in certain property in Orange Grove Tank Farms to this contract, provided that 20% of the proceeds of the sale of certain property in the
Orange Grove Tank Farms (representing the 20% undivided interest of Ogburn in certain property in the Orange Grove Tank Farms) which is subject to his second mortgage and the subject of this contract shall be divided as follows:
". . . .
 "C. Third, reimbursement of Youngblood, Marx and America's Best, Inc., from said 20% of the proceeds of the sale, which is subject to the second mortgage of Long and the subject of this contract, of amounts equal to a) 20% of all funds paid by them to Aluminum Company of America towards the obligation referred to in subparagraph A without contribution by Ogburn; and b) 22% of all funds paid by them to SouthTrust Bank towards the obligation referred *Page 987 
to in sub-paragraph B without contribution by Ogburn; together with interest on the sums so paid from the date of payment to the date of said sale at the prime rate in effect at the time each payment was made, plus 5%. The prime rate shall be as posted at relevant times by the Chemical Bank of New York."
The Investors presented expert testimony from Grady Wayne Boggan, a certified public accountant. Based on his opinion that the parties had intended the reimbursement under subparagraph 3(C) to be made from Long's 20% share of the proceeds, Boggan calculated that Long was entitled to only $6,132, while the Investors would be entitled to $264,673.
In support of his claim, Long presented expert testimony from Louis G. Russell, a certified public accountant, who stated that based on what he considered to be the plain, unambiguous language of the agreement, Long was entitled to $123,597. Russell based his opinion on a literal reading of the agreement, deducting the reimbursement provided under subparagraph 3(C) from the total proceeds of the condemnation, not merely from Long's 20% share. Under Russell's calculations, the Investors would receive $92,729.
Except for an $11,000 figure regarding payment of taxes, Boggan and Russell used the same figures in reaching their respective opinions regarding the division of the award. The difference in their opinions lay in their interpretation of the agreement itself. Boggan testified that he applied an interpretation of the agreement emphasizing its general purpose as declared in the opening three paragraphs. Russell testified that he adhered to the literal language of the contract, especially paragraph 3.
After hearing testimony and receiving documentary evidence, the circuit court entered a judgment dividing the condemnation award among the various parties who had filed claims. The State had paid the $873,500 award into court as a condition of its appeal to the circuit court, and this amount had accrued interest during the probate and circuit court proceedings. Alcoa had settled with the Investors for $200,000 and had received that amount from the condemnation proceeds. The circuit court judgment refunded to the State $263,296.57, apparently the excess of its deposit above the amount of the circuit court award, with adjustment for interest. The attorney representing the Investors was awarded $133,272.11 pursuant to his contract to represent them in the condemnation proceedings; Long was awarded $70,000; and the Investors were awarded the balance on deposit, $254,019.94.
The circuit court judgment included findings of fact; however, the judgment does not make clear the basis of the decision. At one point the judgment refers to the March 12, 1987, agreement as being ambiguous, and at another point it speaks of conforming the agreement to the intention of the parties.
In his appeal, Long argues that the circuit court erred either in construing the agreement on the basis of extrinsic evidence or in reforming the agreement on the basis of a finding of a mutual mistake. Long contends that the written agreement was unambiguous and that the circuit court erred in not enforcing it according to its terms. From the amounts awarded in the circuit court's judgment, it is apparent that the circuit court did not enforce the agreement according to its written terms. For example, although paragraph 3(D) provided for the discharge of the note and mortgage held by Long, under the judgment Long received only the $70,000 face amount of the loan to Ogburn, without any payment of the $50,469 or more in accrued interest.
In their appeal, the Investors argue that although, they say, the circuit court properly found the contract ambiguous or reformed it based on a mutual mistake, it miscalculated the judgment. In accordance with the evidence of the alleged true intention of the parties presented at trial, they contend that Long is entitled to only $6,132 and that they are entitled to $264,673.[2] *Page 988 
The first issue, therefore, is whether the agreement is ambiguous. We hold that it is not. Paragraph 3 of the agreement is enforceable without the need for any interpretation. Both accountants testified that Russell's calculations followed the literal terms of paragraph 3. Whether an instrument is ambiguous is a question of law for the court. McDonald v. U.S.Die Casting Dev. Co., 585 So.2d 853, 855 (Ala. 1991); Dill v.Blakeney, 568 So.2d 774, 778 (Ala. 1990). "In order to ascertain the intentions of the parties, the plain and clear meaning of the instrument's terms is to be given effect, and the parties are presumed to have intended what the terms clearly state."Federal Land Bank of New Orleans v. Terra Resources, Inc.,373 So.2d 314, 319-20 (Ala. 1979). The trial court's judgment cannot be sustained as an interpretation of an ambiguity in the agreement.
The major thrust of the Investors' argument is that the agreement should be reformed to state the true intent of the parties. They say that a mutual mistake was made, because, they say, the parties' true agreement was that Long would reimburse the Investors for 20% of their payments to Alcoa and SouthTrust out of the proceeds he would otherwise receive.
 "When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, so far as it can be done without prejudice to the rights acquired by third parties in good faith and for value."
Ala. Code 1975, § 8-1-2.
The Investors argue for reformation only on the basis of mutual mistake; they do not argue fraud or that they made a unilateral mistake of which Long was aware.
A mutual mistake must be proved by clear, convincing, and satisfactory evidence. Beasley v. Mellon Financial ServicesCorp., 569 So.2d 389 (Ala. 1990); Clemons v. Mallett,445 So.2d 276 (Ala. 1984); Pinson v. Veach, 388 So.2d 964 (Ala. 1980). "[T]here is a presumption arising from the instrument itself supporting it as the true agreement." Jim Walter Homes, Inc. v.Phifer, 432 So.2d 1241, 1243 (Ala. 1983).
 "Where the reformation is based on mistake, the existence of a valid agreement to which the instrument can be made to conform is essential. The trial court cannot make the instrument express a new contract for the parties. . . . Where the sole ground for reformation is mistake, the mistake must be mutual as to all of the parties, but only in the sense that they must all have agreed to the same terms and have mistakenly assumed that those terms were properly expressed in the instrument."
Beasley v. Mellon Financial Services, 569 So.2d at 393-94.
The Investors did not prove by clear, convincing, and satisfactory evidence that the true agreement between the parties was different from the agreement expressed in the instrument. Their attempt to insert language into the first sentence of paragraph 3 and into paragraph 3(C) does not express the agreement for which they argue, because paragraphs 3(A), 3(B), 3(D), and 3(E) would have to be similarly amended. Paragraph 3 is coherent and capable of application as drafted but, reworded as the Investors say it should be reworded, it would be convoluted and difficult to apply.
Furthermore, the record provides no indication as to why Long would have agreed to the provisions for which the Investors argue. As the parties understood matters at the time of the agreement, Long's note was secured by a second mortgage on a 20% interest in the property, subordinate only to the Alcoa vendor's lien. After the agreement, Long's mortgage was also subordinated to the SouthTrust loans, to 20% of the amounts paid by the Investors to Alcoa and 22% of the amounts paid to SouthTrust, and to the fees and expenses of sale. The Investors *Page 989 
would also require that Long actually pay them out of the Ogburn loan proceeds for the amounts paid to Alcoa and SouthTrust for servicing the Investors' loans. Essentially, according to the Investors, Long agreed to take the risk of a low sales price but did not achieve any corresponding reward. They would treat him as an owner, not as a lienholder. If Long had exercised the option to buy Ogburn's 20% interest, he would have placed himself in such a position, but he did not exercise the option.
Thus, there was not clear and convincing evidence that the parties intended the agreement argued for by the Investors. On the contrary, the agreement as expressed in the document fits the apparent intentions of the parties. At the time, the Investors were reluctant to make periodic interest payments to Alcoa and SouthTrust without contributions from Ogburn. Paragraph 3(C), as written, allows them to recover 20% or 22% of any such interest payments before Long's note is paid. Thus, they receive a contribution for Ogburn's share of the payments before Long receives payment on Ogburn's note. This accomplishes an objective that the parties can reasonably be deemed to have intended.
Because there was not clear, convincing, and satisfactory evidence of an alternative agreement that the parties actually intended but mistakenly failed to incorporate in the written agreement, the judgment cannot be affirmed on the theory that the trial court reformed it to reflect the true agreement of the parties.
The Investors also argue that Long is not entitled to payment from the condemnation proceeds because, they say, Ogburn's mortgage failed to create a lien on the property. In 1983, the property was sold for payment of delinquent taxes. The State purchased the property at the tax sale. On September 23, 1988, the State conveyed the property to M R Properties, Inc., for $3,042. On March 17, 1989, M R Properties, Inc., gave a quitclaim deed conveying the property to the Investors for "$10 and other good and valuable consideration." The Investors argue that title was in the State in 1986 when Ogburn purported to give a mortgage to Alabama Credit Corporation. However, they took the position in March 1987 that Long had a valid second mortgage on an undivided 20% interest in the property. In fact, they accepted from Ogburn a deed conveying his 20% interest as part of the consideration for the agreement. Long, on behalf of Alabama Credit, promised to subordinate his claimed interest as set out in paragraph 3 in consideration for the Investors' promise to pay the Ogburn note from the proceeds of a sale of the property. In paragraph 3(E) of the March 1987 agreement, the Investors contracted "to discharge the note and mortgage held by Long on Ogburn's undivided interest." Moreover, in their first two answers to Long's claim in this action, filed on July 17 and August 3, 1992, the Investors admitted that "a second mortgage on a 20% undivided interest in certain property in the Orange Grove Tank Farms, made by A.P. Ogburn, Jr. to Alabama Credit Corporation, was recorded on June 10, 1986." They first denied the validity of the purported mortgage in their amended answer filed on September 15, 1992. Having contracted with Long in March 1987 under a mutual understanding that the Investors and Ogburn owned title to the property, the Investors are estopped to deny the validity of the mortgage that formed the basis for their contract.
We have considered the other arguments made by the Investors and find no merit in them. The judgment is reversed and the cause is remanded for the entry of a judgment dividing the proceeds of the condemnation sale according to the formula set out in paragraph 3 of the parties' written agreement. The principal difference in the award should be that Long will be awarded interest in accordance with the terms of the note, and the Investors' share of the proceeds will be reduced accordingly. Long also argues that his attorney fees incurred in the collection of the note should be paid, but we note that his claim for distribution of proceeds makes no claim for such fees, but makes only a claim for principal and interest.
REVERSED AND REMANDED.
HORNSBY, C.J., and HOUSTON, KENNEDY and COOK, JJ., concur.
[1] The other two investors later conveyed their interests to Youngblood, Marx, and America's Best.
[2] We recognize that the differing calculations do not correspond and are difficult to compare. This is due in part to the effect of interest accrued on the condemnation proceeds. It also appears that the $264,673 claimed by the Investors is only the balance of the proceeds awardable under paragraph 3(F), whereas the $254,019.94 awarded by the trial court would include other amounts, such as the amount due the investors under paragraph 3(C) and an amount intended to reimburse them for fees and expenses paid and reimbursable under paragraph 3(D). *Page 990