Sullivan, Long Hagerty ("Sullivan Long") brought a declaratory judgment action against Southern Electric Generating *Page 723 
Company ("SEGCO"), seeking to determine SEGCO's obligations to contribute to a federal retirement fund for the benefit of Sullivan Long employees who had performed work under a 1974 contract between the parties. The trial court entered a summary judgment for SEGCO, holding that any obligation to contribute to the fund ended when the contract expired. Sullivan Long appeals.
 I.
In 1974, Sullivan Long signed a five-year contract with SEGCO, agreeing to mine and deliver coal from SEGCO land. SEGCO agreed to pay Sullivan Long 50 cents per ton of coal produced, as well as other "Costs," as provided for in the contract. These "Costs" were set out in Paragraph 12(g)(4)(A) of the agreement:
"12. 'Costs.' . . .
". . . .
 "(g) Labor Costs. 'Costs' shall include all proper charges for labor incurred by the Mining Company in the prosecution of the mining operations upon the Lands hereunder, where properly stated, identified and invoiced to the full extent necessary to identify such labor as being required for such mining operations. Included in this category shall be:
 "(1) Mine Labor: The cost of wages for the time worked by hourly, daily and monthly nonadministrative and nonexecutive employees of the Mining Company (such as those who at the time of this Agreement may be covered by a union contract) who are engaged directly in mining, preparation and delivery of coal from the Lands, excepting, however, any employee benefits or labor welfare charge.
 "(2) Maintenance Labor: The cost of wages for full-time or part-time nonadministrative and nonexecutive employees of the Mining Company for time worked by them directly in keeping the plant and property of the Mining Company being used in operations hereunder in suitable working condition shall be chargeable as a 'Cost' hereunder.
 "(3) Supervisory and Clerical Cost: The cost not included in (1) and (2) above of salaries and/or wages of other employees of the Mining Company engaged directly in mining operations under the Lands hereunder or whose primary duties relate to such operations including superintendents, foremen, engineers, prospectors, watchmen, accountants, clerks, timekeepers, materialmen, etc. If any employees of the Mining Company of the foregoing classifications are not engaged exclusively or full time in the mining operations upon the Lands hereunder or in work related thereto, then the cost of salaries or wages of such employees includable herein is the pro rata portion thereof representing the portion of their working time spent directly in such mining operations upon the Lands or related work.
 "(With reference to (1), (2), and (3) above, the Mining Company shall, before beginning operations hereunder, submit for the written approval of SEGCO a schedule setting out job classifications, wage scales, ranges of salaries and compensation for such jobs, pertaining to employees for whose wage and salary cost payment is authorized under (1), (2), and (3) above. After the approval of such schedule, no additional classifications and no increase in such salaries, wages or compensation beyond the upper limits of such schedule for the applicable classification shall be permitted or made effective so as to be paid for by SEGCO hereunder without the prior written approval of SEGCO. Such schedules shall be jointly reviewed by the parties at regular intervals.
"(4) Employee Benefits Charges.
 "(A) Welfare and Retirement Funds. The cost of required contributions to a welfare and retirement fund of any properly recognized bargaining unit of the Mining Company employees as now in effect or as same may be later amended during the term of this Agreement, and the cost of any contributions, payment or levy for employee benefits in the future applicable to employees such as those who are at the time of execution of [the] agreement covered by union contract, insofar as such costs are related to the mining of coal by [Sullivan Long] from the Lands. The existing agreement with the recognized *Page 724 
bargaining unit of Mining Company employees provides for the payment into a welfare and retirement fund by each operator signatory to the union contract of the sum of 75¢ per ton of each ton of coal as produced for use or for sale. With respect to coal so produced from the Lands during the term of this Agreement, SEGCO shall make such payment of 75¢ per ton (or any corresponding amended payment amount) to the Mining Company for the account of such welfare and retirement fund.
The Mining Company and SEGCO shall agree upon the method of determining the tonnage so produced for use or for sale as required for computing the amount of the payment to be made for the account of such welfare and retirement fund."
(Some emphasis original; other emphasis added.)
The term "welfare and retirement fund" in this provision refers to the 1950 and 1974 United Mine Workers of America Benefit Plans and Trusts (hereinafter "1950/1974 Trusts"), which provided health care benefits to coal industry employees who retired before 1974. As a signatory to the National Bituminous Coal ("NBC") Wage Agreements that established the 1950/1974 Trusts, Sullivan Long was required during the term of its contract with SEGCO to contribute to the 1950/1974 Trusts.
Pursuant to Paragraph 12(g)(4)(A), SEGCO paid these contributions on Sullivan Long's behalf. When, in the late 1970's, nationwide contributions to the 1950/1974 Trusts dropped precipitously because of changes in the coal industry, a third NBC Agreement in 1978 restructured the 1950/1974 Trusts. SEGCO then paid the adjusted amount of Sullivan Long's required contribution to the restructured fund, until the contract terminated in 1979.
In 1992, in response to escalating health care costs and a continued depletion in contributions to the 1950/1974 Trusts, Congress enacted the Coal Industry Retiree Health Benefit Act of 1992 (hereinafter the "Rockefeller Bill"), codified at 26 U.S.C. § 9701-9722. The Rockefeller Bill merged the 1950/1974 Trusts into a combined fund to continue supplying, to the maximum extent possible, the same level of health care benefits that the 1950/1974 Trusts would have provided to coal industry retirees.
To bring more money into this combined fund, the Rockefeller Bill required the signatories to the 1978 Trust, and signatories of any subsequent NBC Wage Agreements, to pay an annual premium to the combined fund. The annual premium payments represented the cost of continuing the benefits that were available under the 1950/1974 Trusts, plus a pro rata cost of providing benefits to unassigned beneficiaries, or "orphan retirees," whose employers have since gone out of business or have not been signatories to the NBC Agreements and are thus not subject to the Rockefeller Bill requirements.
As a signatory to the NBC Agreements, Sullivan Long was required to make payments of $2,029.19 per month into the combined fund. In November 1993, Hiram Y. McKinney, senior vice-president and secretary-treasurer of Sullivan Long, wrote to SEGCO, requesting reimbursement for Sullivan Long's past payments into the combined fund. He also requested that SEGCO assume future payments into the fund for the miners who had worked for Sullivan Long on the 1974 SEGCO contract. SEGCO refused both requests; this action followed.
 II.
On its motion for summary judgment, SEGCO argued that "welfare and retirement" benefits are not the same as "employee benefits" under federal law, and that its obligation to pay Sullivan Long's contribution to the 1950/1974 Trusts was a welfare and retirement benefit that terminated with the contract in 1979. Sullivan Long argued that the contributions to "a welfare and retirement fund" that SEGCO agreed to assume were an "employee benefit," and that, because the contract required SEGCO to pay "employee benefits in the future," it must now contribute into the combined fund under the Rockefeller Bill. The trial court held that the employee benefits provided for in the SEGCO contract were different from those under the Rockefeller Bill and that *Page 725 
SEGCO thus had no responsibility for the payments.
We note that Paragraph 12(g)(4) of the parties' contract is entitled "Employee Benefits Charges" and that subsection (A) is entitled "Welfare and Retirement Funds"; thus, the parties apparently agreed that "welfare and retirement" benefits were a subset within the term "employee benefits." We do not, however, agree with the parties that we can interpret Paragraph 12(g)(4)(A) by merely determining whether the term "employee benefits" is synonymous with the term "welfare and retirement benefits." Instead, we must look to the language of the parts contained in the contract.
Terms of a written instrument should be construed in parimateria and a construction adopted that gives effect to all terms used. Federal Land Bank of New Orleans v. TerraResources, Inc., 373 So.2d 314 (Ala. 1979). Inconsistent parts in a contract are to be reconciled, if susceptible of reconciliation; however, if that is not possible, any doubt will be resolved in favor of the first part, considering the instrument as a whole. Scherf v. Renfroe, 266 Ala. 35,93 So.2d 402 (1957).
The first half of the first sentence in Paragraph 12(g)(4)(A) refers to a specific "welfare and retirement fund," and the second half of it refers to "employee benefits in the future." The "retirement and welfare fund" referred to was the 1950/1974 Trusts, which are now combined under the Rockefeller Bill. There are three additional references to this "welfare and retirement fund" in Paragraph 12(g)(4)(A), specifically setting out the method of calculating the amount of the contributions that SEGCO was to make, based on the tonnage of coal produced, and clearly providing that these contributions would cease with the contract. In contrast, the general term "employee benefits in the future" is used once in the second part and is then never mentioned again.
To reconcile the two parts of the first sentence of Paragraph 12(g)(4)(A), we conclude that they required SEGCO to (1) make specific contributions to a designated welfare and retirement fund i.e., the 1950/1974 Trusts, based on the number of tons of coal produced, for the duration of the contract, and (2) remain obligated to pay for other employee benefits in the future, in relation to the mining of the coal during the contract. The first part refers to a specific obligation to contribute to one certain fund for a limited time, and the second part is a "catchall" that reserves the right to impose obligations for other employee benefits as they materialize. To hold otherwise would render one part or the other meaningless; we will not consider a part of an agreement to be meaningless where, as here, the language of the parts may be construed to give effect to each. Federal Land Bank, supra.
The payments Sullivan Long must make to the combined fund under the Rockefeller Bill are merely a continuation of its obligation as a signatory to the relevant NBC Agreements to contribute to the 1950/1974 Trusts. Under the contract, SEGCO's obligation to make these payments to a "welfare and retirement" fund on Sullivan Long's behalf terminated with the contract, in 1979. The trial court, therefore, properly entered the summary judgment in SEGCO's favor; that judgment is affirmed.
AFFIRMED.
MADDOX, ALMON, SHORES, and HOUSTON, JJ., concur.