[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 14, 2005
THOMAS  K. KAHN
CLERK

————————————————

No. 03-15125

————————————————

D. C. Docket No. 03-00302-CV-S-E

WESTPORT INSURANCE CORPORATION,

Plaintiff-Appellee,

versus

TUSKEGEE NEWSPAPERS, INC.,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama

————————————————

**(March 14, 2005)**

Before EDMONDSON, Chief Judge, and MARCUS and PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

In this diversity case, Tuskegee Newspapers, Inc. ("Tuskegee Newspapers")

appeals from an order of summary judgment entered in favor of Westport

Insurance Corp. ("Westport") in this declaratory judgment action brought by Westport after Tuskegee Newspapers was sued for damages resulting from negligent failure to include a legal foreclosure notice in three weekly editions of The Tuskegee News. After argument, the magistrate judge, to whose jurisdiction the parties had consented, ruled that the language of the insurance policy was unambiguous and granted final judgment in favor of Westport. Because the language of the insurance policy can be reasonably interpreted to provide coverage in this case and, under Alabama law, ambiguities in insurance policies must be construed in favor of the insured, we reverse and remand with instructions to enter summary judgment for Tuskegee Newspapers.

## I.

Tuskegee Newspapers publishes a weekly newspaper called The Tuskegee News in Macon County, Alabama. The newspaper regularly publishes legal notices in its legal advertisement section. On or about October 19, 2001, Tuskegee Newspapers received an order for a foreclosure notice to appear in the October 25, November 1, and November 8, 2001 editions of The Tuskegee News on behalf of First Union Savings Bank ("First Union"). Although Tuskegee Newspapers published editions of The Tuskegee News on October 25, November

2

1, and November 8, it did not publish the foreclosure notices requested by First Union.

On November 21, 2002, First Union filed a third-party complaint against Tuskegee Newspapers for negligent failure to publish the foreclosure advertisements. Tuskegee Newspapers requested that Westport, with whom it had a Communications Liability Insurance Policy, undertake its defense and agree to indemnify it for any judgment rendered against it. Westport provided a defense under reservation of rights and, on March 18, 2003, filed this action for declaratory judgment in the United States District Court for the Middle District of Alabama, seeking a declaration that it owed Tuskegee neither a defense nor indemnification.

The Communications Liability Insurance Policy (the "Policy") at issue was in force for the policy period October 1, 1999 to October 1, 2002, and provided coverage for liability arising out of torts including defamation, disparagement, invasion of privacy, outrage, plagiarism, piracy, copyright infringement, trademark infringement, or any other tortious act "committed in the utterance or dissemination of matter by or with the permission of the NAMED INSURED or its subsidiary during the policy period in the named publication(s) and in any advertising of the same publication(s)."

The Policy also included an Errors and Omissions Endorsement -- the provision of the contract at the heart of this suit -- that reads, in pertinent part:

The coverage afforded by the Communications Liability portion of Section I, COVERAGE, is extended to include any negligent error, omission, misstatement or misleading statement by or with the permission of the NAMED INSURED or its subsidiary in matter which is uttered or disseminated during the policy period in the manner described in Section I of the policy, subject to all of the provisions of the policy and to all of the additional provisions specified herein.

The trial court ruled that the plain language of the Policy unambiguously extended coverage solely to omissions occurring within materials actually printed in The Tuskegee News and not to a complete omission of an entire legal notice. The magistrate judge concluded that Tuskegee Newspapers' failure to publish First Union's legal advertisements in its newspaper did not trigger coverage under the Policy and, accordingly, granted summary judgment in favor of Westport. On appeal Tuskegee Newspapers argues that coverage exists under the Special Errors and Omissions Endorsement. It contends that the word "matter," which is not

defined in the Policy, should be read to refer to the newspaper in its entirety, thereby affording coverage to the wholesale omission of the legal notice, which is an "omission . . . in matter which is uttered or disseminated."

## II.

Under Alabama law, a contract is ambiguous "when a term is reasonably susceptible to more than one interpretation." Ex parte Harris, 837 So. 2d 283, 290 (Ala. 2002) (citing Cannon v. State Farm Mut. Auto. Ins. Co., 590 So. 2d 191, 194 (Ala. 1991)). When the contract at issue is an insurance policy, any ambiguity is "to be resolved in favor of coverage." Sullivan v. State Farm Mut. Auto. Ins. Co., 513 So. 2d 992, 994 (Ala. 1987). Westport says that the language of the Errors and Omissions Endorsement is susceptible of only one reasonable interpretation, and under that interpretation, the Tuskegee Newspapers' omission of the foreclosure notice is not covered. This argument is based on the ideas that (1) the word "matter" must take identical meanings in both the communications liability provision and the errors and omissions provision; and that (2) "matter" means content actually printed in the Tuskegee News. We are persuaded by neither.

As to the first, Westport's argument that simply because a contract must be read as a whole means that a particular word must be read identically wherever it is used in the contract is unsupported by Alabama law. Alabama law requires

5

simply that an agreement "must be construed in its entirety, and a single provision or sentence is not to be disassociated from others having reference to the same subject matter." Yu v. Stephens, 591 So. 2d 858, 859 (Ala. 1991); see also Attorneys Ins. Mut. of Ala. v. Smith, Blocker & Lowther, P.C., 703 So. 2d 866, 870 (Ala. 1996) ("Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions."). We cannot derive from this principle that, under Alabama law, whenever a particular word appears in a contract, it must be read to refer to precisely the same thing each time it is used. We can find no occasion on which any Alabama court has articulated such a rule and, sitting in diversity, we are unprepared to do so today.

Moreover, accepting the basic principle that we must construe the agreement as a whole, we find that it is perfectly reasonable to read the term "matter," each time it is used, in the particular context in which it is used. This makes sense since, although the communications liability and the omissions liability sections are part of a single insurance policy, the nature of the coverage they provide is very different (as evidenced by the fact that the two types of coverage are outlined separately and in separate sections of the Policy). Plainly,

6

the purpose of omissions coverage is to guard against liability arising out of what is _missing_ from the contents of the newspaper, whereas the purpose of communications coverage is to guard against liability arising out of what _actually appears_ in the paper. Accordingly, a perfectly reasonable interpretation of the Policy could read the term "matter" as having different contours when used in reference to the _communications_ by Tuskegee Newspapers that the Policy covers, than when used in reference to the _omissions_ by Tuskegee Newspapers that the Policy covers.

Still another factor counseling against reading "matter" identically in both sections of the Policy is that the term is modified differently in each section. Westport's definition of matter as content actually appearing in the _Tuskegee News_ relies on the fact that matter, as used in the communications liability section, is _modified by the phrase "in the named publication(s)_." This suggests that when "matter" is later used, in the omissions liability section, _without_ that qualifier, it may reasonably be read as referring to _any_ matter uttered or disseminated by Tuskegee Newspapers. The purpose of the qualifying language in the communications liability section appears to be to limit the scope of liability for affirmative statements by Tuskegee Newspapers only to those contained within the newspaper. The absence of any similar qualifying language in the omissions

7

liability section suggests that coverage for omissions was intended to extend to any material whose absence from the newspaper created liability based on one of the enumerated torts.

But even if we accepted Westport's argument that we must construe "matter" identically in each section of the contract, we would remain unpersuaded by its second contention, that we must read "matter" as meaning content actually printed in the Tuskegee News. For one thing, the word "matter" is an inherently flexible and  imprecise term, whose particular meaning is highly contextual. Significantly, the word is nowhere defined in the Policy. Without definitions, we must give the words of the Policy "their customary and normal meaning." Pritchett v. State Farm Mut. Auto. Ins. Co., 834 So. 2d 785, 791 (Ala. 2002); see also W. World Ins. Co. v. City of Tuscumbia, 612 So. 2d 1159, 1161 (Ala. 1992) (observing that "the language in an insurance policy should be given the same meaning that a person of ordinary intelligence would reasonably give it."). Common definitions of "matter" that could reasonably be inserted into the Policy here include "the substance of which a physical object is composed," or, more specifically, "something written or printed." Webster's Third New Int'l Dictionary, at 1394 (1961 ed.).

Giving matter, in both sections of the Policy, its more specific common meaning of "something written or printed" would be at least as reasonable as Westport's reading, and it would yield the conclusion that Tuskegee Newspapers' omission of the foreclosure notice can reasonably be read to be covered under the Policy. The communications liability coverage would encompass liability arising out of certain torts "committed in the utterance or dissemination of something written or printed . . . in the [Tuskegee News]." The omissions liability coverage would extend to any "omission . . . in something written or printed which is uttered or disseminated." To be sure, some degree of ambiguity would remain in the scope of this latter coverage, but an undoubtedly reasonable reading of "something written or printed" would be as encompassing the Tuskegee News in its entirety.

Not only are we satisfied that this reading, based on the common definition of "matter," is perfectly reasonable, but also we question whether Westport's proffered reading is a better one. For one thing, Westport's reading would render redundant the phrase "and in any advertising of the same publication(s)," used in the communications liability coverage section of the Policy. If "matter" means, as Westport argues it does, any material actually printed, including individual advertisements, then the first section of the Policy covers liability for torts

9

"committed in the utterance or dissemination of material actually printed, including advertisements . . . in the named publication(s) and in any advertising of the same publication(s)." Alabama law counsels that we must avoid, whenever possible, a construction that renders contractual language superfluous or redundant. See, e.g., Royal Ins. Co. of Am. v. Thomas, 879 So. 2d 1144, 1154 (Ala. 2003) ("It being presumed that every condition was intended to accomplish some purpose, it is not to be considered that idle provisions were inserted. Each word is deemed to have some meaning, and none should be assumed to be superfluous. All portions of a policy should be considered in construing it. Accordingly, a court will attempt to give meaning and effect, if possible, to every word and phrase in the contract in determining the meaning thereof, and a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions . . . ." (quoting J. Appleman, Insurance Law and Practice § 7383 (1981))); Sullivan, Long & Hagerty v. S. Elec. Generating Co., 667 So. 2d 722, 725 (Ala. 1995); Fed. Land Bank of New Orleans v. Terra Res., Inc., 373 So. 2d 314, 320 (Ala. 1979).

Moreover, Westport's reading would yield the altogether anomalous result that coverage would not exist if Tuskegee Newspapers omitted the entire foreclosure notice, but it would exist if the paper forgot to include, for example,

10

the address of the property subject to foreclosure, or even any identifying information at all. If the notice simply read "property will be foreclosed," or even if it appeared simply as a blank box containing no words at all, coverage would exist under Westport's reading because the omission of key information was from a notice that technically appeared (albeit in very small part) in the newspaper. The consequences of these omissions of key information would be identical to the consequences of a wholesale omission of the foreclosure notice -- that is, notice of the foreclosure sale of a particular property would not be transmitted -- but coverage would exist only for the former. We cannot say that "a person of ordinary intelligence" would "reasonably" read the policy as covering the former, partial omissions but not the latter, wholesale omissions in legal notices. See W. World Ins., 612 So. 2d at 1161.

Still another problem with Westport's reading is that, even if we accept Westport's definition of "matter" as material actually printed, the Policy could reasonably be read to cover Tuskegee Newspapers' omission of the foreclosure notice. The problem is one of increments. That is, "material actually printed" need not be reduced to the smallest unit of the particular foreclosure notice. Instead, "material actually printed" could be read to mean the section of the newspaper in which legal notices appear. As such, the omission of the foreclosure

11

notice in this case would constitute an "omission . . . in material actually printed" -- namely, the foreclosure notices section of the paper. Alternatively, "material actually printed" could be taken to refer to a particular page of the newspaper. If the foreclosure notice was supposed to appear on a particular page of the newspaper -- for example, it was included in the layout for page C-10, but never made it onto page C-10 -- the error would constitute an "omission . . . in material actually printed" -- namely, page C-10. Again, we cannot say that "a person of ordinary intelligence" would more "reasonably" read "matter" as referring to one unit of the newspaper rather than another. See W. World Ins., 612 So. 2d at 1161.

Finally, given the nature of an "omission," we question whether "matter" can reasonably be read as "content actually printed" in the Tuskegee News. An omission is commonly understood to be "something neglected or left undone." Webster's Third New Int'l Dictionary, at 1574 (1961 ed.). Thus, assuming that "matter," in the communications liability coverage section of the Policy, means content actually printed in the Tuskegee News, giving identical meaning to "matter" in the omissions liability section would ensure that no omission is ever covered by the Policy. An omission, by definition, is never "in matter which is uttered or disseminated," if "matter" means "content actually printed." Accordingly, "matter" may sensibly be defined as material actually printed for

purposes of the latter coverage, but imputing that definition into the context of the former coverage would defeat the purpose of that section of the policy by rendering omissions liability nugatory -- a result that we clearly should avoid. See, e.g., Royal Ins. Co., 879 So. 2d at 1154.

Because Westport's definition of "matter" is not the only meaning that term can reasonably be read to take, and because the Policy is still susceptible of more than one reasonable reading even if we give "matter" Westport's preferred meaning, we are constrained to conclude that the Policy is susceptible to the interpretations of both parties and therefore ambiguous. Under Alabama law, any ambiguity in an insurance policy is "to be resolved in favor of coverage." Sullivan v. State Farm Mut. Auto. Ins. Co., 513 So. 2d 992, 994 (Ala. 1987). Accordingly, we REVERSE and REMAND with instructions to enter summary judgment for Tuskegee Newspapers.

REVERSED and REMANDED.