Rel: March 21, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in Southern Reporter.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

_____

### SC-2024-0673

_____

**Ex parte Triad of Alabama, LLC, d/b/a Flowers Hospital**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Wiregrass Rehabilitation Center, Inc.**

**v.**

**CHSPSC, LLC, and Triad of Alabama, LLC, d/b/a Flowers Hospital)**

**(Houston Circuit Court: CV-23-900380)**

WISE, Justice.

Triad of Alabama, LLC, d/b/a Flowers Hospital ("Triad"), petitions this Court for a writ of mandamus directing the Houston Circuit Court to vacate its August 23, 2024, order denying Triad's motion to dismiss,

based on improper venue, the complaint Wiregrass Rehabilitation Center, Inc. ("WRC"), filed against it and to enter an order dismissing WRC's complaint against it.  We grant the petition and issue the writ.

Facts and Procedural History

On October 28, 2020, CHSPSC, LLC ("CHS"), a Tennessee limited-liability corporation with its principal place of business in Franklin, Tennessee, entered into a "Purchased Services Agreement" ("the purchasing agreement") and a "Linen Services Agreement" ("the linen-services agreement") with WRC, an Alabama nonprofit corporation with its principal place of business in Dothan.  The effective date of both agreements was November 1, 2020.

The purchasing agreement provided, in pertinent part:

> "WHEREAS, CHS is contracted to provide professional management services to affiliates of CHSPSC, LLC, and also holds an ownership interest in various Affiliates (see Attachment C, List of Participating CHS Affiliates); and
>
> "WHEREAS, CHS has a need to contract for Linen and Laundry Services on behalf of its Affiliates; and
>
> "WHEREAS, Service Provider is in the business of providing Linens and Laundry Services on behalf of its Affiliates; and
>
> "WHEREAS, CHS and Service Provider previously entered into an agreement for Linen Services dated April 1,

2018 which shall be replaced by this Purchasing Agreement and the Agreement for Linen Services ('Linen Services Agreement') which is attached and incorporated herein as Attachment A; and

"WHEREAS, Service Provider desires to offer certain services to Purchasers;

"NOW, THEREFORE, CHS and Service Provider agree that Service Provider shall provide the services described herein to Purchasers in accordance with the terms and conditions set forth herein."

(Emphasis in original.) The purchasing agreement designated WRC as the "service provider" and defined "[p]urchaser(s)" "as Affiliates of CHS that have entered into a Participation Purchasing Agreement and their Affiliates and are listed in Attachment C." Additionally, the purchasing agreement provided that "Purchasers obtaining Services from Service Provider under this Purchasing Agreement shall be considered third party beneficiaries hereunder." It is undisputed that Triad was an affiliate of CHS and a third-party beneficiary under the purchasing agreement.

Section 26.0 of the purchasing agreement included the following integration clause:

"This Purchasing Agreement, the Linen Services Agreement, and all attachments hereto (as well as the agreements and other documents referred to in this

Purchasing Agreement) <u>constitute the entire agreement between the Parties with regard to the subject matter hereof</u>. This Purchasing Agreement supersedes all previous agreements between or among the Parties with regard to subject matter. <u>There are no agreements, representations, or warranties between or among the Parties other than those set forth in this Purchasing Agreement or the documents and agreements referred to in this Purchasing Agreement</u>."

(Emphasis added.)

The linen-services agreement was designated as Attachment A to the purchasing agreement. Attachment B to the purchasing agreement was a document titled "Additional Provisions" ("the additional-provisions document"). The introductory paragraph of the additional-provisions document stated:

"In its performance under this Purchasing Agreement, Service Provider agrees to the following additional terms, which are incorporated by reference and are made fully a part thereof. Any ambiguity or conflict shall be resolved in favor of these Additional Provisions."

The additional-provisions document also included the following choice-of-law provision and forum-selection clause:

"10. <u>Choice of Law</u>. The Purchasing Agreement shall be construed and governed by the laws of the state of Tennessee, irrespective of its choice-of-law principles. Each Party irrevocably agrees that any claim brought by it in any way arising out of this Purchasing Agreement must be brought solely and exclusively in state courts located in Davidson County, Tennessee or federal courts located in the

Middle District of Tennessee and each Party irrevocably accepts and submits to the sole and exclusive jurisdiction of each of the aforesaid courts in personam, generally and unconditionally with respect to any action, suit, or proceeding brought by it or against it by the other Party."

Pursuant to the purchasing agreement and the linen-services agreement, WRC provided linen and laundry services to Flowers Hospital, which is owned and operated by Triad.

On September 25, 2023, WRC sued CHS in the Houston Circuit Court. WRC asserted claims of breach of contract and conversion relating to WRC's provision of linen and laundry services. The complaint referenced only the linen-services agreement. CHS subsequently filed a motion to dismiss the complaint, based on improper venue, and relied on the forum-selection clause in the additional-provisions document.

On November 30, 2022, WRC amended its complaint to add Triad as a defendant. In the amended complaint, WRC alleged, in pertinent part:

"7. On or about October 28, 2020, [WRC] and Defendant CHS entered into a Linen Services Agreement (the 'Agreement') which is attached as Exhibit A.

"8. Under the Agreement, [WRC] would rent hospital linens to Flowers at agreed pricing.

"....

"13. Beginning with the date of the execution of the Agreement on October 28, 2020, [WRC] performed its obligations under the Agreement and delivered the requested volume of linens each day to Flowers. As the parties continued to do business, Flowers began a pattern of failing to return all of the linens [WRC] was providing under the Agreement.

"14. Under the Agreement the cost of these non-returned linens was borne by [WRC] until the Agreement was terminated.

"15. [WRC] notified Flowers and CHS of this problem, attempting to minimize the volume of non-returned linens. Flowers and CHS acknowledged that there was a problem with Flowers' failure to return the same volume of linens [WRC] was delivering to it and assured [WRC] it was attempting to address the cause.

"16. The volume of non-returned linens was so large and beyond that of [WRC's] other clients that [WRC] worked with Flowers to resolve the issue, but the volume of non-returned linens continued to increase to a point that [WRC] could no longer continue purchasing replacement linens to meet Flowers' needs.

"17. Despite Flowers' assurances, the problem persisted. From October 28, 2020, through December 13, 2022, Flowers failed to return almost 150,000 pounds of linens valued at $804,668.00. [WRC] had to terminate the Agreement due to Flowers' conduct. [WRC] notified CHS of this termination by letter on December 13, 2022, which is attached as Exhibit B.

"18. After this termination of the Agreement the Defendants requested that [WRC] continue to provide linens under the Agreement long enough for Defendants to obtain a replacement linen vendor. [WRC] agreed to continue to

provide linens under the same terms as set out in the Agreement and did so.

"19. The Agreement provides that Defendants are obligated to return all of [WRC's] property provided under the Agreement and that once the Agreement is terminated, the Defendants would be obligated to pay [WRC] for any property not returned.  (Exhibit A at ¶ 17).

"20. After the termination of the Agreement and the period of time the parties agreed to continue doing business after the Agreement was terminated, [WRC] made demand that all of its property be returned.  On June 23, 2023, Defendant informed [WRC] that all property belonging to [WRC] that was in its possession had been returned to [WRC].

"21. At the conclusion of the time wherein [WRC] provided linen services under the Agreement and after its termination [WRC] sent invoices to Defendant for the services provided and for the cost of all the non-returned linen.

"22. Defendant made some payments to [WRC] towards the amount owed for property not returned to [WRC] but has refused to pay the remaining balance.  As of the filing of this Complaint, the total owed for property not returned to [WRC] is $636,133.73 exclusive of interest, attorney fees or costs."

WRC asserted a breach-of-contract claim in which it alleged that the defendants had willfully breached the linen-services agreement "by failing to timely pay [WRC] for property not returned to [WRC]."  In that claim, WRC sought a judgment in the amount of $636,133.73 plus interest, attorneys' fees, and costs.  WRC also asserted a conversion claim in which it alleged:  "In not returning [WRC's] property, the Defendants

7

have exerted ownership and dominion over [WRC's] property in denial of [WRC's] rights." With regard to that claim, WRC sought "compensatory, punitive, consequential and incidental damage[s], interest, and costs."

On January 9, 2024, Triad filed a motion to dismiss, based on improper venue, and relied on the forum-selection clause in the additional-provisions document. WRC filed a response to Triad's motion to dismiss.[1] In its response, WRC made the general allegations that, if the forum-selection clause was enforced, "it would lack the ability to subpoena certain information and witnesses, not just that witnesses would be required to travel substantial distances"; that the Tennessee courts "would not have jurisdiction to hear [WRC's] extra-contractual claims against Triad for conversion"; and that "the Linen Services Agreement is distinct from the Purchased Services Agreement and therefore is not subject to the forum selection clause."

---

[1]In its response, WRC stated that it "adopts its response … to [CHS's] Motion as if set forth fully herein." Additionally, WRC's response referenced CHS's arguments in its reply to WRC's response. However, neither party has presented this Court with a copy of WRC's response to CHS's motion to dismiss or CHS's reply to WRC's response.

The trial court conducted a hearing on the motions to dismiss. However, the parties have not provided this Court with a transcript of that hearing. After the hearing, WRC filed a supplemental response to the motions to dismiss, and CHS and Triad filed a supplemental memorandum of law in support of their motions to dismiss.

On August 23, 2024, the trial court entered an order denying Triad's motion to dismiss. Triad subsequently petitioned this Court for a writ of mandamus directing the trial court to vacate its August 23, 2024, order denying its motion to dismiss and to enter an order granting its motion to dismiss.

## Standard of Review

> """'Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.' Ex parte Integon Corp., 672 So. 2d 497, 499 (Ala. 1995)."
>
> "'Ex parte CTB, Inc., 782 So. 2d 188, 190 (Ala. 2000). In Ex parte CTB, this Court established that a petition for a writ of mandamus is the proper vehicle for obtaining review of an order

denying enforcement of an "outbound" forum-selection clause when it is presented in a motion to dismiss. Indeed, an attempt to seek enforcement of the outbound forum-selection clause is properly presented in a motion to dismiss without prejudice, pursuant to Rule 12(b)(3), Ala. R. Civ. P., for contractually improper venue. Additionally, we note that a party may submit evidentiary matters to support a motion to dismiss that attacks venue. <u>Williams v. Skysite Communications Corp.</u>, 781 So. 2d 241 (Ala. Civ. App. 2000), quoting <u>Crowe v. City of Athens</u>, 733 So. 2d 447, 449 (Ala. Civ. App. 1999).'

"<u>Ex parte D.M. White Constr. Co.</u>, 806 So. 2d 370, 372 (Ala. 2001). Further, 'a trial court's ruling on the question of enforcing a forum-selection clause' will be vacated if the court exceeded its discretion. <u>Id.</u>"

<u>Ex parte International Paper Co.</u>, 285 So. 3d 753, 756-57 (Ala. 2019).

<u>Discussion</u>

Triad argues that the trial court erroneously denied its motion to dismiss. In its mandamus petition, Triad argues that this "action concerns a Linen Services Agreement that is an integrated part, adopted and incorporated into the [purchasing agreement]"; that the purchasing agreement includes a forum-selection clause that provides that Tennessee is the exclusive forum for any claim arising out of the purchasing agreement; that Triad is a third-party beneficiary of the purchasing agreement; and that "[t]he enforcement of the forum selection

10

clause is neither unfair nor unreasonable."   In response, WRC argues that the language in the integration clause of the purchasing agreement "unambiguously excludes the forum selection clause." Answer, p. 5.  It also argues that, if the purchasing agreement does not specifically exclude the forum-selection clause, "there is [an] ambiguity rendering the forum selection clause unenforceable."  Answer, p. 7.

The only real issue in this case is whether the additional-provisions document, which includes the forum-selection clause, is incorporated into the purchasing agreement.[2]  In its answer to the mandamus petition, WRC asserts:

> "The Purchasing Agreement states in Section 26, titled Integration, that '[t]here are no agreements, representations or warranties between and among the Parties other than those <u>set forth in this Purchasing Agreement</u> or the documents and agreements <u>referred to in this Purchasing Agreement</u>.' (emphasis added) …. 'A merger clause only operates to establish that a written agreement is a completely integrated document, into which all prior and <u>contemporaneous negotiations</u> are merged.'  <u>Crimson Industries, Inc. v. Kirkland</u>, 736 So. 2d 597, 601 (Ala. 1999) (emphasis added).  The [purchasing agreement] refers to only three documents:  Attachment A - Linen Services Agreement; Attachment B - Service Provider's Supplies; and Attachment C - List of Participating CHS Affiliates.  …

_____

[2]In its answer to the mandamus petition, WRC does not argue that the enforcement of the forum-selection clause would be either unfair or unreasonable under the circumstances.

"The forum selection clause relied upon by Triad in its petition is found in an attachment titled 'Additional Provisions.' ... The Purchasing Agreement does not contain a single reference to an attachment or document titled 'Additional Provisions.' The only Attachment B referenced in the Purchasing Agreement is in paragraph 3.17 which states 'Service Provider's Supplies: Service Provider shall supply those Service disposables reasonably necessary for Services as set forth in Attachment B hereto.' ... Because there is no reference in the Purchasing Agreement to a document entitled 'Additional Provisions' and the only Attachment B referred to in the Purchasing Agreement is the 'Service Provider's Supplies,' the Additional Provisions are specifically excluded by the Purchasing Agreement's Integration clause and, therefore, not a part of the Purchasing Agreement."

Answer, pp. 5-6.

"Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. See Loerch v. National Bank of Commerce of Birmingham, 624 So. 2d 552, 553 (Ala. 1993). Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. See Ex parte Dan Tucker Auto Sales, Inc., 718 So. 2d 33, 36 (Ala. 1998). If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. See id. at 36; Voyager Life Ins. Co. v. Whitson, 703 So. 2d 944, 948 (Ala. 1997). On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. See Whitson, 703 So. 2d at 948. Under those established rules of contract construction, where there is a choice between a valid

12

construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. See <u>id.</u> at 948-49; <u>Sullivan, Long & Hagerty v. Southern Elec. Generating Co.</u>, 667 So. 2d 722, 725 (Ala. 1995). Additionally, 'if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed.' <u>City of Fairhope v. Town of Daphne</u>, 282 Ala. 51, 58, 208 So. 2d 917, 924 (1968); see <u>Whitson</u>, 703 So. 2d at 949. Last, if all other rules of contract construction fail to resolve the ambiguity, then, under the rule of <u>contra proferentem</u>, any ambiguity must be construed against the drafter of the contract. See <u>Lackey v. Central Bank of the South</u>, 710 So. 2d 419, 422 (Ala. 1998)."

<u>Homes of Legend, Inc. v. McCollough</u>, 776 So. 2d 741, 746 (Ala. 2000).

As Triad notes in its reply brief to this Court, WRC's argument in this regard relies solely on the third sentence of the integration clause while completely ignoring the first sentence of that clause. Section 26.0 of the purchasing agreement provides:

"This Purchasing Agreement, the Linen Services Agreement, <u>and all attachments hereto</u> (as well as the agreements and other documents referred to in this Purchasing Agreement) <u>constitute the entire agreement between the Parties with regard to the subject matter hereof</u>. This Purchasing Agreement supersedes all previous agreements between or among the Parties with regard to subject matter. There are no agreements, representations, or warranties between or among the Parties other than those set forth in this Purchasing Agreement or the documents and agreement referred to in this Purchasing Agreement."

13

(Emphasis added.)

When reading the integration clause as whole, it is clear that any attachments to the purchasing agreement, such as the additional-provisions document identified as Attachment B to the purchasing agreement, were incorporated into the purchasing agreement. Thus, the integration clause did not specifically exclude the additional-provisions document.

WRC argues that, even if the integration clause did not specifically exclude the additional-provisions document that included the forum-selection clause, "there is [an] ambiguity rendering the forum selection clause unenforceable." Answer, p. 7.

> "The Purchasing Agreement's Integration clause restricts the agreements and covenants to only 'those <u>set forth in this Purchasing Agreement</u> or the documents and agreements <u>referred to in this Purchasing Agreement</u>.' (emphasis added) …. It is undisputed that the Purchasing Agreement does not contain a forum selection clause in the body of the agreement and does not contain any reference to an 'Attachment B: Additional Provisions' document. … The only Attachment B referenced therein is in Section 3.17 which states '<u>Service Provider's Supplies</u>: Service Provider shall supply those Service disposables reasonably necessary for Services as set forth in Attachment B hereto.' ... Thus, there is conflict within the document as to what Attachment B is and what purpose it serves. Additionally, by failing to properly identify the attachment, an argument could be made

14

that WRC was not placed on notice that there were additional provisions, such as a forum selection clause, that could require WRC to litigate any dispute in a jurisdiction that has no ties to or involvement in the Purchasing Agreement."

Answer, pp. 7-8.

As we noted previously, the first sentence of the integration clause specifically provided that all the attachments to the purchasing agreement were part of the agreement. For the most part, the purchasing agreement included "CHS Purchased Services Agreement Template - September 2019" in the bottom left corner of each page and a designation of "Page __ of 24" in the bottom right corner of each page.[3] The signature page of the purchasing agreement was on page 19 of 24. Page 20 of 24 stated:

"ATTACHMENT A
"LINEN SERVICES AGREEMENT

"See attached Linen Services Agreement"

The additional-provisions document was labeled "ATTACHMENT B" and was numbered pages 21 of 24 and 22 of 24. Finally, page 23 of 24 stated:

---

[3]The first page of the purchasing agreement did not include this information. Rather, it appeared on the top the following page that was otherwise blank.

15

"ATTACHMENT C

"LIST OF PARTICIPATING CHS AFFILIATES AND PRICES FOR SERVICES

"Per Addendum B of Attachment A, Linen Services Agreement"

Page 24 of 24 was blank.  Section 3.17 of the purchasing agreement stated: "Service Provider shall supply those Service disposables reasonably necessary for Services as set forth in an <u>Attachment B</u> hereto." (Emphasis in original.)  However, there is no separately designated attachment to the purchasing agreement itself that deals with service disposables or that sets forth services to be provided by WRC.[4]

When viewing the purchasing agreement and its attachments as a whole, the additional-provisions document was a clearly marked and paginated attachment to the purchasing agreement.  Additionally, the additional-provisions document specifically stated:

> "In its performance under this Purchasing Agreement, Service Provider agrees to the following additional terms, which are incorporated by reference and are made fully a part

---

[4]The linen-services agreement, which was Attachment A to the purchasing agreement, was a separately paginated document that included Addenda A-E.  The linen-services agreement and its addenda set forth detailed information about the services to be provided by WRC and the pricing for those services.

16

thereof. Any ambiguity or conflict shall be resolved in favor of these Additional Provisions."

Thus, WRC's assertion that the failure to properly identify the attachment could support an argument "that WRC was not placed on notice that there were additional provisions, such as a forum selection clause," is not persuasive. Accordingly, WRC's claim of ambiguity is without merit.

For these reasons, the trial court exceeded its discretion when it denied Triad's motion to dismiss.

## Conclusion

Based on the foregoing, we grant Triad's mandamus petition and issue the writ directing the trial court to vacate its August 23, 2024, order denying Triad's motion to dismiss and to enter an order dismissing WRC's claims against Triad.

PETITION GRANTED; WRIT ISSUED.

Stewart, C.J., and Shaw, Bryan, Mitchell, Cook, and McCool, JJ., concur.

Sellers, J., concurs in the result.

17